**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **DANIEL LARAYE HOLMAN,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )      **Case No. 14-CV-0696-JHP-FHM** |
| | ) |
| **JEORLD BRAGGS, JR., Warden,**[1] | ) |
| | ) |
| **Respondent.** | ) |

## OPINION AND ORDER

Petitioner, a state inmate proceeding pro se, brings this 28 U.S.C. § 2254 petition for writ

of habeas corpus (Dkt. # 1) to challenge his convictions in the District Court of Tulsa County, Case

No. CF-2010-2933, for felony murder, attempted robbery with a dangerous weapon, and attempted

first degree rape. Petitioner claims he is entitled to federal habeas relief because he was deprived

of his Sixth Amendment right to the effective assistance of trial counsel. Respondent filed a

response (Dkt. # 10) to the petition and provided the state court record necessary to adjudicate

Petitioner's claim (Dkt. ## 10, 11, 12). Petitioner did not file a reply. For the reasons discussed

below, the Court shall deny the petition for writ of habeas corpus.

## *BACKGROUND*

In the District Court of Tulsa County, Case No. CF-2010-2933, the State of Oklahoma

charged Petitioner with first degree felony murder (Count I), first degree burglary (Count II),

---

[1]      According to the Oklahoma Department of Corrections website, Petitioner is currently in custody at Lexington Correctional Center (LCC). See https://okoffender.doc.gov, last visited February 22, 2018. Accordingly, the LCC's warden, Jeorld Braggs, Jr., is substituted in place of Robert Patton as party respondent. See Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts. The Clerk of Court shall note the substitution on the record.

attempted robbery with a dangerous weapon (Count III), and attempted first degree rape (Count IV). O.R., 15-16. Petitioner was tried by a jury, and the following facts were developed at trial.

Around 3:30 a.m. on July 15, 2010, Petitioner and Derreon Carter walked from the Windsor Village apartment complex to the Brighton Park apartment complex. Tr. IV, 170, 172-74. Both apartment complexes are located near 51st and Yale in Tulsa, Oklahoma. Tr. III, 7; Tr. IV, 170-71. Petitioner followed Carter up some stairs and entered into Elizabeth Craig's second-floor apartment through her unlocked front door. Tr. III, 12; Tr. IV, 173-74. Craig was in her living room when the two men walked in. Tr. III, 16-17. She testified she had just returned from a trip to Taco Bell and Walgreens and the men entered her apartment "within probably 20 seconds" of her return. Id. at 11-19. Carter "shoved something cold and sharp against [Craig's] neck," and shoved her onto the couch. Id. at 20-21. He then asked Craig where she kept her money, and Craig screamed. Id. at 22. Carter threatened to kill her if she screamed again, and repeated his demand for money. Id. Craig testified she directed Carter's attention to her purse, and Petitioner picked up the purse and "started carrying it around the apartment." Id. at 22-23. At some point, Petitioner "dropped" the purse near the television. Id. at 29. Craig testified Petitioner also discovered that her boyfriend, Shannon Chambers, was asleep in the bedroom and "yelled out to Carter, 'Hey, she's got somebody in here.'" Id. at 11, 30. Carter continued to hold a weapon against Craig's throat and drug her into the bedroom. Id. at 31. For a few seconds, Carter, Craig, and Petitioner "stood at the foot of [her] bed" and "just kind of looked at" Chambers while Chambers continued sleeping. Id. at 31-32.

Carter then drug Craig back to the couch and ordered her to take off her clothes. Tr. III, 32-33. When Craig resisted, he tried to pull off her sweat pants. Id. at 33-35. According to Craig, Petitioner was "kind of watching, but not participating." Id. at 33. When Craig noticed her purse

was on the floor in front of the television, she told Carter, "Please, just let me get you my money." Id. at 35-36. Carter continued holding a weapon against her throat and allowed her to crawl to her purse. Id. at 37. Craig testified she reached inside her purse, located her handgun, pointed it in the general direction of both men, and pulled the trigger. Id. at 36-38. Both men jumped on Craig, a struggle ensued, and Craig fired two more rounds. Id. at 38-41; Tr. IV, 193-94. Chambers, Craig's boyfriend, testified he awoke to the sound of gunshots and emerged from the bedroom. Tr. III, 124-25. While Chambers wrestled with both men, Craig stood up and waited for "two clear shots." Tr. III, 42-44, 126-27; Tr. IV, 194. Craig ultimately shot Carter in the back of the head, rendering him unconscious, and shot Petitioner in the forehead. Tr. III, 47-48, 85. Craig kept her gun trained on Petitioner while she called 911. Id. at 129-30. Each man sustained two gunshot wounds and both were taken to a nearby hospital. Tr. III, 176-79, 183-85; Tr. IV, 182-87. Carter died from his injuries; Petitioner survived. Tr. III, 163; Tr. IV, 108-11.

Craig testified she had never seen either Carter or Petitioner before the home invasion and that they entered her apartment suddenly and without her consent. Tr. III, 16-20, 49-50. In contrast, Petitioner testified Craig was sitting on her living room floor when the men entered her apartment, Carter walked in and sat down near Craig, and it appeared to Petitioner that the two knew each other. Tr. IV, 174-76. Petitioner testified Carter and Craig began to argue at some point, he heard a gunshot, and the two men began struggling with Craig in an attempt to gain control of the gun. Id. at 177-78. He denied that he had any weapons when he entered Craig's apartment and testified he did not enter the apartment with the intent to rob or sexually assault Craig. Id. at 187-89.

The jury found Petitioner guilty as charged. Tr. V, 118-19. At sentencing, the state district court dismissed the burglary conviction because it merged with the felony murder conviction. S.

3

Tr., 17, 19-20. Consistent with the jury's sentencing recommendations, the court imposed concurrent prison sentences of life for the murder conviction, 15 years for the attempted robbery conviction, and 2.5 years for the attempted rape conviction. Id. at 19-20.

After sentencing, Petitioner moved for a new trial. O.R., 185. He alleged he had newly discovered, material evidence that he could not have discovered before trial, namely, evidence that Craig and Carter knew each other before the home invasion. Id. at 185-86. In support of his motion, Petitioner attached an affidavit from Ernest Johnson. Id. at 189-90 (Johnson Aff., May 10, 2012). In the affidavit, Johnson swore he knew Petitioner, Carter, and Craig. Id. at 189. Johnson stated he accompanied Carter to Craig's apartment several times and, on one occasion about one week before the home invasion, Johnson heard Craig threaten to kill Carter. Id. Johnson described Craig as a "pill lady" who was known to sell "tabs" and "bars" and stated that Craig would sometimes give Carter free pills because she and Carter were dating. Id. Johnson also stated he was incarcerated shortly after the home invasion, but he was released sometime before signing his affidavit. Id.

In August 2012, the state district court held a hearing on the motion for new trial. Mot. Hrg. Aug. 27, 2012, Tr., 1. Petitioner presented testimony from two witnesses: Alan Holman and Anthony Jones. Id. at 2. Holman, Petitioner's father, testified he attempted to gather information after the trial that might help Petitioner establish a connection between Craig and Carter. Id. at 8-9. Petitioner's friend, Tasha Jones, told Holman to speak with Ernest Johnson. Id. at 8-9. Holman spoke with Johnson over the phone and sent him a photo of Craig. Id. at 9-10. Johnson said he had information about Craig and he would be willing to testify. Id. at 9-11. Holman made arrangements for Johnson to meet with the attorney who filed Petitioner's motion for new trial. Id. at 10-11. Anthony Jones testified he heard shortly after the home invasion that Carter had been killed by

4

"some girl named Veronica." Mot. Hrg. Aug. 27, 2012, Tr., 14-15. Before Petitioner's trial, Jones learned it was Craig who shot Carter. Id. at 15-16. Jones testified he attended the trial, heard Craig's testimony, knew Craig was lying about knowing Carter, and waited until after the trial to tell trial counsel that Craig and Carter knew each other. Id. at 18-19, 21, 24-25.

At the end of the hearing, the court denied Petitioner's motion for new trial. Mot. Hrg. Aug. 27, 2012, Tr., 32. The court found evidence of a pre-existing relationship between Craig and Carter "would certainly be material" and "important" to support Petitioner's trial testimony. Id. at 30-31. However, because that evidence came from three people Petitioner knew before trial—Ernest Johnson, Anthony Jones, and Tasha Jones—the court found "the evidence could have been discovered prior to trial with due diligence." Id. at 31. The court further found, in light of Anthony Jones' friendship with Petitioner, that Petitioner failed to show a "reasonable probability that had [the] newly discovered evidence been introduced at trial it would have changed the outcome." Id. at 31-32.[2]

Petitioner filed a direct appeal with the Oklahoma Court of Criminal Appeals (OCCA). O.R., 193. In his appellate brief, Petitioner asserted one proposition of error: he was deprived of his Sixth Amendment right to the effective assistance of trial counsel. Dkt. # 10-1 at 10. He specifically alleged trial counsel (1) failed to adequately investigate whether there was a pre-existing relationship between Craig and Carter, (2) presented an incoherent defense strategy by suggesting that the men entered Craig's apartment by mistake, and (3) failed to use readily available evidence recovered from Craig's apartment—i.e., an empty taco wrapper from Taco Bell—to impeach Craig's testimony

---

[2]     The state district court also noted that it was unable to assess Johnson's credibility because Petitioner did not call Johnson to testify at the hearing on the motion for new trial. Mot. Hrg. Aug. 27, 2012, Tr., 31-32.

that the home invasion occurred "less than twenty seconds" after she returned to her apartment. Id. at 10-16.

Petitioner also filed an application for an evidentiary hearing on his Sixth Amendment claim. Dkt. # 10-2. In support, Petitioner provided a second affidavit from Ernest Johnson. Dkt. # 10-2 at 9-11 (Johnson Aff. Nov. 27, 2012). In an unpublished order, the OCCA granted the application, finding "sufficient evidence . . . showing a strong possibility counsel was ineffective for failing to utilize" evidence that may have impeached Craig's credibility and supported Petitioner's testimony. Dkt. # 10-5 at 1-2; see Rule 3.11(B)(3)(b)(I), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2018) (requiring applicant seeking remand for evidentiary hearing to show "by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence"). As a result, the OCCA remanded the case to the state district court for an evidentiary hearing. Dkt. # 10-5 at 2.

The state district court held the evidentiary hearing in August 2013. Evid. Hrg. Aug. 28, 2013, Tr., 1. Petitioner presented testimony from three witnesses: (1) Corporal Terrence Campbell from the Tulsa Police Department, (2) Ernest Johnson, and (3) trial counsel. Id. at 1-2, 5. The State presented testimony from Elizabeth Craig. Id. at 2. Following the hearing, the state district court issued written findings of fact and conclusions of law (Dkt. # 10-6) based on the evidence presented at the hearing on the motion for new trial and the evidentiary hearing.[3]

---

[3]     On federal habeas review, a state court's factual findings are presumed correct unless the habeas petitioner rebuts that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Because Petitioner has not rebutted the presumption, the Court draws the following facts directly from the state district court's written findings rather than from the hearing transcripts.

As relevant to Petitioner's ineffective-assistance-of-counsel claim, the court found Petitioner's father conducted a post-trial investigation, obtained Ernest Johnson's name from Petitioner's friend, and arranged for Johnson to provide an affidavit. Dkt. # 10-6 at 3. At the evidentiary hearing, Johnson, a convicted felon, testified he knew Petitioner and Carter for a few years before the home invasion, he recorded music with Petitioner, and he lived in the same apartment complex as Carter. Id. at 4. Johnson heard about the shooting right after it happened, went to prison on an unrelated matter some time after the shooting, and was released from prison in August 2011. Id. No one contacted Johnson on Petitioner's behalf until after the trial. Id.

Johnson also identified Craig from a photograph admitted at trial and testified he recognized Craig as one of Carter's girlfriends. Dkt. # 10-6 at 4. Johnson testified he had seen Craig and Carter together on three occasions before the home invasion: once at a convenience store near Craig's apartment and twice when he accompanied Carter to Craig's apartment. Id. He also testified he and Carter would go to Craig's apartment to obtain Xanax and Lortab from Craig. Id. At the evidentiary hearing, Craig "adamantly denied" knowing Carter before the home invasion or selling pills to anyone. Id. at 7.

Petitioner's friend, Anthony Jones,[4] learned almost one year before trial that Craig shot Carter and Petitioner. Dkt. # 10-6 at 3. Jones testified he attended the trial and heard Craig testify at trial that she did not know Carter, but he waited until after the trial to tell trial counsel he had seen Craig and Carter together before the home invasion. Id.

---

[4]    Anthony Jones is incorrectly referred to as Austin Jones in some portions of the state court record. See, e.g., Dkt. # 10-6 at 3; Dkt. # 10-7 at 6; Dkt. # 10-9 at 3. It is clear, however, from the remaining portions of the record that the witness referred to is Anthony Jones.

At the evidentiary hearing, Corporal Campbell testified that after the home invasion law enforcement officers found (1) a Taco Bell sack on Craig's couch, (2) one empty taco wrapper inside the sack along with uneaten food items, and (3) what appeared to be a Taco Bell napkin beside the sack. Id. at 3-4. Campbell testified this evidence was consistent with Craig's trial testimony that she had just returned home from Taco Bell. Id. at 4. He also testified this evidence could support a finding that Craig ate one taco after she returned to her apartment. Id. Craig testified at the evidentiary hearing that she had no recollection of having eaten one taco as she drove home from Taco Bell, but she also testified it would be common for her to do so. Id. at 6-7.

Trial counsel testified that before trial he tried but failed to find a connection between Carter and Craig. Dkt. # 10-6 at 4-5. Specifically, he directed his investigator and legal assistant to search for a connection through "electronic means." Id. at 5. He also spoke with Petitioner's friends and relatives, but he found none who knew Craig. Id. Trial counsel did not recall whether, after the trial, Jones told him about a connection between Carter and Craig. Id. Based on trial counsel's testimony, the court found counsel "recognized early that it would be important to establish some kind of relationship between Carter and Craig," and "commenced a course of inquiry of his client and others calculated to determine if there were people who could establish that fact." Id. at 5-6.

Trial counsel also testified he developed a number of defense strategies before trial. Dkt. # 10-6 at 6. Specifically, trial counsel anticipated Petitioner might testify that he and Carter were invited to Craig's apartment, but trial counsel could not be certain until the close of State's evidence whether Petitioner would testify at trial. Id. The court found that, based on that uncertainty, trial counsel "attempted to place before the jury the possibility of a mistaken entry, which could have

raised a reasonable doubt about as to first degree burglary." Id. At the evidentiary hearing, trial counsel referred to evidence presented at trial that two screwdrivers were found at the crime scene. Id. at 6. Trial counsel testified he believed this evidence supported a mistaken-entry defense because it was plausible Petitioner and Carter "entered the wrong apartment," and Craig "misinterpreted their intentions," overreacted by shooting the men, "then concoct[ed] a story more favorable to her, including the screwdrivers." Id. The court found "[m]uch of this strategy was dependent upon [trial counsel's] belief that jurors would not find it likely that a home invasion robbery would be committed with screwdrivers as the weapons." Id.

Armed with these factual findings, the state district court analyzed Petitioner's ineffective-assistance-of-counsel claim under Strickland's two-part framework. Dkt. # 10-6 at 7-9. First, the court concluded Petitioner "failed to demonstrate that [trial counsel's] search for witnesses to corroborate Petitioner's story was so lacking as to fall below an objective standard of reasonableness." Id. at 8. The court reasoned trial counsel not only identified "early on" the importance of finding evidence linking Craig to Carter, but also "engaged his staff, an independent electronic investigator, his client, [and his] client's friends and family" in the search for such evidence. Id.

The court found whether Petitioner demonstrated prejudice was a "closer question." Dkt. # 10-6 at 8. The court specifically found the testimony from Jones and Johnson[5] was "substantially impeached" by (1) Jones' friendship with Petitioner, (2) Johnson's status as a convicted felon, and (3) both witnesses' failure to come forward with favorable evidence until after the trial despite their

---

[5]     In this portion of the state district court's ruling, the court twice mistakenly refers to Johnson as Carter, Petitioner's deceased accomplice. Dkt. # 10-6 at 8. Nonetheless, the court's meaning is clear from the context of its discussion.

prior knowledge of a connection between Craig and Carter. Id. Ultimately, the court concluded "[t]he testimonies of Jones and Johnson both suggested that their stories had been made up after their friend was convicted of felony murder." Id. at 9. The court further concluded that "no reasonable juror would have reasonable doubt as to Ms. Craig's testimony without objective evidence pointing to an association of Ms. Craig with [Carter]." Id. at 8-9.

As to trial counsel's strategic decision to present a mistaken-entry defense, the court noted, "[s]trategic decisions are virtually unassailable on appeal," and concluded trial counsel's decision was not objectively unreasonable. Dkt. # 10-6 at 9. Similarly, the court concluded trial counsel's failure "to cross-examine Elizabeth Craig about where she ate part of her [Taco Bell] meal" did not render trial counsel's performance deficient. Id. The court ultimately concluded Petitioner failed to show prejudice stating, "[n]either the mistaken entry suggestion nor the forgotten taco wrapper undermine this court's confidence in the verdict." Id.

After the state district court issued its written findings and conclusions, the State and Petitioner filed supplemental appellate briefs. See Dkt. ## 10-7, 10-8. By unpublished summary opinion filed November 20, 2013, in Case No. F-2012-447 (Dkt. # 10-9), the OCCA rejected Petitioner's Sixth Amendment claim and affirmed his convictions and sentences.

On November 19, 2014, Petitioner filed the instant habeas petition (Dkt. # 1) and a motion for an evidentiary hearing (Dkt. # 2).[6]

---

[6]    In a previous order, the Court denied Petitioner's motion for an evidentiary hearing but reserved final determination on his request pending the Court's review of the petition, response, and any reply. See Dkt. # 4. Because the state district court held an evidentiary hearing on Petitioner's ineffective-assistance-of-counsel claim and the OCCA adjudicated that claim on the merits, the Court finds that Petitioner is not entitled to an evidentiary hearing. See Cullen v. Pinholster, 563 U.S. 170, 185 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the

*ANALYSIS*

Petitioner seeks federal habeas relief on one ground: he alleges he was deprived of his Sixth Amendment right to the effective assistance of counsel because trial counsel (1) failed to adequately investigate the link between Carter and Craig, (2) presented an incoherent mistaken-entry defense, and (3) failed to use readily available evidence to impeach Craig's trial testimony. Dkt. # 1 at 5; Dkt. # 1-1 at 10-16.

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs federal habeas review of constitutional claims brought by state prisoners. See 28 U.S.C. § 2254. Respondent concedes, and the Court finds, that Petitioner (1) timely filed his habeas petition, see id. § 2244(d), and (2) exhausted available state remedies as to his Sixth Amendment claim, see id. § 2254(b)(1)(A). See Dkt. # 10 at 2. Because the OCCA adjudicated Petitioner's claim on the merits, this Court may grant habeas relief only if the OCCA's adjudication of that claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

By design, § 2254(d)'s "standard is difficult to meet." Harrington v. Richter, 562 U.S. 86, 102 (2011); see also Burt v. Titlow, 134 S. Ct. 10, 16 (2013) (emphasizing that § 2254(d) "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court"). And in applying § 2254(d)'s "highly deferential standard," the Court must give the

---

limitation of § 2254(d)(1) on the record that was before the state court."); see also Rule 8(a) Rules Governing Section 2254 Cases in the United States District Courts.

OCCA's decision the "benefit of the doubt." Pinholster, 563 U.S. at 181 (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002)). As a result, to obtain habeas relief under § 2254(d), a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

Here, the OCCA correctly identified Strickland v. Washington, 466 U.S. 668 (1984), as the clearly established federal law governing Petitioner's ineffective-assistance-of-counsel claim. Dkt. # 10-9 at 5. Under Strickland, a defendant must show (1) his counsel's performance was deficient and (2) the deficient performance was prejudicial. 466 U.S. at 687. Applying Strickland, the OCCA determined Petitioner failed to make either showing. Dkt. # 10-9 at 5-6.

When a state court applies the correct federal law to deny relief, the sole question for a federal habeas court is whether the state court applied the law "in an objectively unreasonable manner." Bell v. Cone, 535 U.S. 685, 699 (2002). A state-court decision "involve[s] an unreasonable application of clearly established Federal law," if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams v. Taylor, 529 U.S. 362, 407-08 (2000). However, an unreasonable application by the state court is "not merely wrong; even 'clear error' will not suffice." White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (citing Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)).

Standing alone, the Strickland standard is "highly deferential." Knowles v. Mirzayance, 556 U.S. 111, 124 (2009). Under § 2254(d)(1), this Court's review of whether the OCCA unreasonably applied Strickland is "doubly deferential." Id. at 123; see also Pinholster, 563 U.S. at 190 (noting that federal habeas court must take a "highly deferential" look at counsel's performance under

12

Strickland and through "deferential lens of § 2254(d)" (quoting Mirzayance, 556 U.S. at 123 n.2, 124)); Richter, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard.").

As Respondent points out, Petitioner does not argue that the OCCA unreasonably applied Strickland. See Dkt. # 10 at 8, n.1. Rather, to support his request for federal habeas relief Petitioner relies on the arguments he presented to the OCCA in his direct appeal briefs. See Dkt. # 1; Dkt. # 1-1. Given Petitioner's pro se status, the Court liberally construes his arguments as attempting to satisfy § 2254(d)(1)'s standard. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). Nevertheless, viewing the OCCA's decision with double deference, the Court agrees with Respondent that Petitioner fails to show the OCCA's application of Strickland was objectively unreasonable.

In rejecting Petitioner's Sixth Amendment claim on direct appeal, the OCCA reviewed the original record, the trial and post-trial hearing transcripts, the state district court's findings and conclusions, and the parties' briefs. Dkt. # 10-9 at 2. The OCCA determined the state district court's findings were supported by the record, and agreed with the court's legal conclusion that Petitioner was not deprived of his constitutional right to the effective assistance of trial counsel. Id. at 5-6. Giving "strong deference" to the state district court's factual findings and applying Strickland, the OCCA reasoned "[t]rial counsel presented a viable defense and thus fulfilled the function of making the adversarial testing process work." Id. at 4, 6. The OCCA further reasoned Petitioner failed to show "a reasonable probability . . . that, but for any unprofessional errors by

counsel, the result of the trial would have been different as any errors or omissions by counsel did not influence the jury's determination of guilt or sentence." Id.

Having carefully considered the OCCA's decision, the state-court record, and the arguments from Petitioner and Respondent, the Court finds nothing unreasonable about the OCCA's application of Strickland. See 28 U.S.C. § 2254(d)(1). The Court further finds the OCCA's decision was not based on an unreasonable determination of the facts presented in state court proceedings. See id. § 2254(d)(2). Thus, the Court denies habeas relief on Petitioner's Sixth Amendment claim.

## *CONCLUSION*

Because Petitioner has not established that he is in custody in violation of the Constitution or laws or treaties of the United States, the Court denies his petition for writ of habeas corpus.

## **Certificate of Appealability**

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A district court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the district court has rejected a petitioner's constitutional claims on the merits, the applicant must make this showing by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Because the Court finds Petitioner has not made the requisite showing, the Court denies a certificate of appealability.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of the Court shall note the substitution of Jeorld Braggs, Jr., Warden, in place of Robert Patton as party respondent.

2. Petitioner's request for an evidentiary hearing (Dkt. # 2) is **denied**.

3. The petition for a writ of habeas corpus (Dkt. # 1) is **denied.**

4. A certificate of appealability is **denied**.

5. A separate Judgment shall be entered in this case.

**DATED** this 9th day of March 2018

James H. Payne
United States District Judge
Northern District of Oklahoma